UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JAMES W. DAVIDSON,                      *

      Plaintiff                                  *

      v.                                            *           Case No.:  14-20478-CIV

CAPITAL ONE, N.A.,                        *

      Defendant                                *

\*    \*   \*   \*    \*   \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF JOHN ULZHEIMER

John Ulzheimer deposes and states as follows:

1.    I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.    I was retained as a testifying expert in this case by Capital One, N.A. ("Capital One"), the defendant in this action.

3.    Attached hereto is a true and correct copy of the expert report that I prepared for this case.


    I declare under the penalty of perjury that the contents of the foregoing are true and correct.


John Ulzheimer                               Date: 10/22/14


DMEAST #20145910 v1

**EXHIBIT 26**

DEFENDANT CAPITAL ONE, N.A.'S EXPERT REPORT OF JOHN ULZHEIMER IN THE MATTER OF DAVIDSON V CAPITAL ONE, N.A., IN THE U.S DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION, CASE NUMBER 14-20478-CIV

I, John R. Ulzheimer, the undersigned, hereby declare and state the following: I am the president of The Ulzheimer Group, LLC. My business address and telephone number are as follows: 1160 Buckhead Valley Court, Atlanta, Georgia 30324 and (404) 636-3737.

This expert report is based on my 23-plus years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com and Credit.com Educational Services, on my review of relevant documents produced in this matter, and as a result of my previous expert witness work, which is over 150 cases at this point. All of my comments are accurate to the best of my knowledge as of the time I drafted this expert report. All of my opinions and comments stated in this report are expressed to a reasonable degree of professional certainty.

## I. SCOPE OF WORK

I have been asked to do the following:

1. Review the documents provided to me by counsel
2. Offer my expert opinions as to the reasonableness of Capital One's investigation into the Plaintiff's alleged credit reporting dispute.
3. Offer other relevant opinions that may be applicable to the facts

## II. QUALIFICATIONS

### A. Employment History

I spent six (6) years with Equifax Credit Information Services and spent several of those years managing a team of consumer service agents, which handled thousands of consumer calls annually. In addition, my team and I handled the process of logging consumers' credit related disputes, the generating of the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers (The Consumer Dispute Process). While at Equifax I gained an intimate understanding of how credit files are compiled, stored, retrieved and delivered. I also sold various Equifax Credit Marketing Services ("CMS") services, which included lists for preapproved credit card offers.

At FICO (formally referred to as "Fair Isaac Corporation" and is best known for its "FICO" credit scores), I spent an additional seven (7) years gaining an intimate understanding of credit scoring, including how credit scores are designed, developed, used by lenders and impacted by the information in consumer credit files. From time to

time I was also involved with the development of FICO credit bureau scorecards, which are the heart of the credit scores.

At Credit.com I spent an additional six (6) years working with consumers and the media teaching them how the consumer credit system works including topics such as credit reporting, credit scoring, credit cards and debt settlement, to name a few. I was also the developer of the Credit Report Card, a credit-scoring tool that interprets Trans Union, LLC credit data as a credit-scoring model would and then gives the consumer an easy to understand summary of their credit risk.  The tool won several awards in 2009 when it was released.

As a former employee of Equifax, Fair Isaac and Credit.com, I have been exposed to processes and procedures involved in credit reporting, credit report dispute resolution practices, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management practices.

I am also familiar with general underwriting practices, including what lenders consider to determine credit risk.  This includes general opinions that lenders have regarding what they consider to be important and not important from a consumer's credit report.  I gained this knowledge from my many years of working with lenders at my time with Equifax, Fair Isaac and Credit.com.  In fact, the first four years of my time at Fair Isaac I spent working with the mortgage community teaching them how to properly implement credit scoring into their processes.  Fannie Mae and Freddie Mac had just mandated the use of FICO scoring in their desktop underwriting systems, Loan Prospector and Desktop Underwriter.  My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal variables changed, and how to educate their homebuyer customers on the importance of solid credit management.

### B. Presentations/Academia

I have made no less than 500 credit reporting and/or credit scoring presentations during my time in the credit industry.  These presentations were of varying levels of complexity and were delivered to consumers, consumer groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities.

I guest lecture, on an ongoing basis, about credit reporting and credit scoring at The University of Georgia and The Westminster Schools, which are located in or near Atlanta.   I have also taught at Emory University's Center for Lifelong Learning in Atlanta.  At Emory I was the top rated instructor in the Personal Finance and Investments category for the 2005/2006 term based on student feedback. And finally, I volunteer my time to teach credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I have a BS in Criminal Justice from the University of West Georgia, June 1991, and I am well qualified to interpret and discuss the issues at hand in this case. My background and qualifications are further described in my CV, attached hereto as Exhibit A.

### C. Publications

I am a frequent contributor on the topics of consumer credit issues, advice and analysis for various media outlets including USA TODAY, New York Times, Los Angeles Times, CNN.com, Washington Post, Money Magazine, American Banker, Chicago Tribune, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, Bankrate.com, and other regional business and consumer media. I have also written books and training manuals on the same including *You're Nothing but a Number* and my most recent, *The Smart Consumer's Guide to Good Credit*. I am published, on average, 1.5 times each business day.

Within the past ten years I have written books and training manuals on the topic of credit reporting, credit scoring and identity theft. They are as follows:

- *You're Nothing but a Number*
- *The GetCreditWise Tool Kit*
- *Surviving Identity Theft*
- *The Smart Consumer's Guide to Good Credit*

I have also written articles and blogs on the same topics for the following:

- Credit.com's monthly e-newsletter, *Tidbits* – The article, which was called "AskJohn", was published each month by Credit.com.

- Boardroom, Incorporated's monthly newsletter, BottomLine Personal – I write an occasional article for Boardroom, which is published in their BottomLine Personal newsletter.

- CreditBloggers.com – I used to blog occasionally for Credit.com's blog site, CreditBloggers.com.

- Credit.com proper – From 2006 through 2010 I wrote countless articles and consumer alerts that were published by Credit.com on their website or by other companies that syndicated Credit.com's content.

- Enloop.com – I used to write periodically for this website. The topic was usually related to small business credit issues.

- I authored the entire "Credit Scoring Background" section on Wikipedia in 2010[1].

---

[1] Because Wikipedia is subject to user-edits, the current version of this site may contain edits or opinions that I did not author and with which I do not necessarily agree.

- CNBC.com – I used to write periodically about consumer credit and answer viewer emails, both which were published on CNBC's website.

- Bank and Lending Liability Report – CARD Act, the good the bad and the meaningless, March 2010.

- IMS Expert Services Newsletter – Published periodically two years ago.

- New York Times – I have been a blogger on credit score and identity theft topics for the New York Times. They published numerous blogs of mine during 2009 and 2010.

- Mint.com – I was every Monday at Mint.com from July 2010 through July 2010.

- SmartCredit.com – From 2010 to 2013 I was published almost daily on SmartCredit's blog.

- CreditSesame.com – I am published four times a month on CreditSesame's blog.

- National Foundation for Credit Counseling – I am published periodically on the NFCC's Financial Blog.

- Credit Card Insider – I am published twelve times per month on their blog.

- Sky Rocket Media – I am published four times per month on their blog.

- Credit Simple – I am published 16 times per month on their blog.

- CRE Credit Services – I am published 3 times per month on their blog.

- VantageScore Solutions – I am published twice per month on their blog.

### D. Certifications

I am twice FCRA (Fair Credit Reporting Act) certified by the credit reporting trade association, the CDIA (Consumer Data Industry Association), and its predecessor, the ACB (Associated Credit Bureaus).

### E. Previous Expert Witness Work and Testimony

I have been an expert witness in over 150 credit related lawsuits serving on the sides of both Plaintiffs and Defendants and have been admitted as an expert in both Federal and state courts.

I have testified at trial or depositions in the following cases within the past four years:

Jones v GMAC – Deposition, Trial (Sup Ct of CA, Santa Clara Co 107cv082742)

Panitz v Central Mortgage – Deposition, Trial (Sup Ct of CA, Los Angeles YC060960)

Pieri v SunTrust Mortgage – Deposition (127th Dist Ct of Harris Co, TX 10-58560)

Kenny v Safeco Insurance – Deposition, Trial (Sup Ct of WA, Skagit Co 01-2-01600-1)

Chang v Everhome Mortgage – Deposition, Trial (Sup Ct of CA, 30-2010-433519)

Levy v Chase – Deposition (Sup Ct of CA, Los Angeles, West District, BC429088)

Spain v GEMB – Deposition (Superior Court, North Carolina, Pitt County 10CVS2180)

Bibolotti v AHMSI – Deposition (Dist Ct of East Dist of TX, 4:11-cv-00472)

Purscell v TICO Insurance – Deposition (USDC West Dist of MO, 2:12-cv-04039)

Moriarty v Moriarty – Trial (Bergen Co Superior Ct, Hackensack NJ)

Patriot Insurance v McReynolds – Deposition (USDC N. Dist of GA 1:12-cv-0997)

Carlson v Preciado – Deposition (Sup Ct of CA, Los Angeles, BC 414181)

Sokiranski v Reliant Support Service – Deposition (USDC, N Dist of OH 1:12-cv-01624)

Cruz v Covert – Trial (Supreme Ct of NY, Suffolk Co. Index No. 004802)

Thompson v Wells Fargo – Trial (Jefferson Circuit Court, Kentucky Div 2, 11-CI-04347)

Edmondson v Flagstar Bank – Deposition (USDC Northern Dist. of AL, 12-J-03638)

Gardner v Gardner – Trial (3rd Judicial Dist Ct of Salt Lake City, UT 914900261)

Marchman v AHMSI – Deposition (Dist Ct of Harris Co, TX 2012:09917)

LeBourgeois v Allied Home Mortgage – Deposition (Civil Ct, Orleans Parrish 08-2705)

Russo v Bank of America – Deposition, Trial (Sup Ct of San Diego, 37-2012-95724)

Pettway v Wells Fargo – Deposition (USDC Northern Dist of AL, 2:12-CV-03797)

Pele v PHEAA – Deposition (USDC East Dist of VA, 1:13CV1531)

## III. COMPENSATION

I am being paid $395 per hour for all work performed.  This is a typical hourly rate for my services.

## IV. DOCUMENTS REVIEWED

Prior to and during the preparation of this report I reviewed several documents.  A list of said documents is below, in no particular order:

Second Amended Complaint
Memorandum of Law in Support of Motion to Dismiss
Reply in Further Support of Motion to Dismiss
Order on Motion to Dismiss

Documents Bates Stamped P000021-27, 90-92, 100-102, 212-213, 270-274, 278-303, 305-342
Plaintiff's Disclosures
Report of Stephen Moynahan
Spreadsheet representing Davidson ACDVs
Credit Report Documents (P000105-114, 152-161)
Quicken Loans Documents (P000146-151)

## V. COMPLETE STATEMENT OF ALL OPINIONS AND BASIS FOR OPINIONS

### A. Background Regarding the Credit Reporting Industry

#### i. Credit Reporting Agency Background

A credit report is a record of an individual's current and past liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments and bankruptcies only), as well as their account history (also called "trade"). One or more of a variety of companies, which maintain a credit file on a consumer, generates the credit report when requested by a lender, insurance company, the consumer, or another organization with a legal right to view the data.

These companies are called credit-reporting agencies, consumer reporting agencies or credit bureaus. They collect, store, and then deliver the credit report in response, normally, to a request from a lender or insurance company who has received an application. There are three primary companies in the United States that act as the national credit bureaus: Equifax, Inc., Experian Information Solutions, and Trans Union, LLC. Equifax is headquartered in Atlanta, GA and is a public company. Experian has its U.S. headquarters in Costa Mesa, CA and is not a public company in the United States. Trans Union is headquartered in Chicago, IL and is privately held. These three companies each maintain roughly 200 million credit files.

#### ii. Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company or other requesting party when a consumer makes applications for some sort of benefit, such as a home loan, credit card or insurance. The lender, who has an account with the credit bureau, submits a request for the consumer credit file. The credit bureau, using proprietary search logic, compiles the credit report from its vast database. This process is virtually instantaneous, which allows for lenders to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. That information is then used by lenders to determine an individual's credit risk. The lender subsequently approves or denies the request for credit, and/or sets the terms of repayment using this data. The information in a consumer credit report is not "real time," meaning it is not updated dynamically. This causes the data on a credit report to generally be up to 30 days old at any given time.

### iii. Credit Scoring

A credit score is a number that summarizes an individual's credit risk, based on a snapshot of his or her credit report at a particular point in time. A credit score helps lenders evaluate an individual's credit report and estimates his or her likelihood of paying 90 day late on any credit obligation in the subsequent 24 months after the score is calculated. The most widely used credit scores are FICO scores, the credit scores created by the company, FICO. Lenders can buy FICO scores from all three of the major credit reporting agencies. Lenders use FICO scores to help them make billions of credit related decisions every year. FICO develops its scores based on information in consumer credit reports maintained at the credit reporting agencies. A credit score influences the credit that is available to the consumer and the terms (interest rate, credit limits) that lenders offer to the consumer.

Credit scores are determined differently scoring model by scoring model but in general the FICO scoring system is the United States', Canadian and indeed global standard in countries that have a sophisticated credit reporting system.

### a. Factors Affecting Credit Scoring

#### Summary of the FICO credit scoring composition

- 35% - Payment History: Negative information on a credit report
- 30% - Debt: How much and what type
- 15% - Length Of Credit History: How long an individual has had credit
- 10% - Credit Diversity: The variety of credit experiences an individual has had
- 10% - Inquiries (hard): When an individual's credit report is accessed

**Payment history (35%** contribution on the FICO scale) - A record of negative information can potentially, but does not always, lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category FICO considers the severity of the negative item, the age of the negative items and the prevalence of negative items. As a general rule, having no severely negative credit entries[2] is best, having one is poor, and having two or more is worst.

**Debt (30%** contribution on the FICO scale) - This category considers the amount and type of debt carried by a consumer as reflected on his or her credit reports. There are three types of debt considered.

    **Revolving debt** - This is credit card debt, retail card debt and some petroleum cards. And while home equity lines of credit have revolving terms the bulk of

---

[2] In the FICO scoring system a severe delinquency is anything that is currently past due, historically 90 days past due or worse, a public record, a collection, or any account status or narrative the indicates default or severe delinquency.

debt considered in this category is true unsecured revolving debt incurred on plastic. The most important measurement from this category is called "Revolving Utilization", which is the relationship between the consumer's aggregate credit card balances and the available credit card limits, also called "open to buy." This is expressed as a percentage and is calculated by dividing the aggregate credit card balances by the aggregate credit limits and multiplying the result by 100, thus yielding the utilization percentage. The higher that percentage, the lower an individual's score will likely be. This is why closing credit cards is generally not a good idea for someone trying to improve their credit scores. Closing one or more credit card accounts will reduce an individual's total available credit limits and likely increase the utilization percentage unless the cardholder reduces their balances at the same pace.

**Installment debt** - This is debt where there is a fixed payment for a fixed period of time. An auto loan is a good example as an individual generally makes the same payment for 36, 48, or 60 months.

**Open debt** - This is the least common type of debt. This is debt that must be paid in full each month. An example is any one of the varieties of credit cards that are "pay in full" products. The American Express Green card is a common example.

**Time in file** (Credit File Age) (**15%** contribution on the FICO scale) - The older an individual's credit report the more stable it is, in general. As such, an individual's score should benefit from an old credit report. This "age" is determined two ways: the age of the credit file; and the average age of the accounts on the credit file. The age of the credit file is determined by the oldest account's "date opened", which sets the age of the credit file. The average age is set by averaging the age of every account on the credit report, whether open or closed.

**Account Diversity** (**10%** contribution on the FICO scale) -- An individual's credit score will benefit by having a diverse set of account types on his or her credit file. Having experience across multiple account types (installment, revolving, auto, mortgage, cards, etc.) is generally a good thing for an individual's scores because the individual is proving the ability to manage different account types.

**The Search for New Credit** (Credit inquiries) (**10%** contribution on the FICO scale) -- An inquiry is noted every time a company requests some information from a consumer's credit file. There are several kinds of inquiries that may or may not affect one's credit score. Inquiries that have no effect on the creditworthiness of a consumer (including the so-called "soft inquiries"), can remain on credit reports for as little as 6 months and are never visible to lenders or credit scoring models, are:

  o  Prescreening inquiries where a credit bureau may sell a person's contact information to an institution that issues credit cards, loans and insurance based on certain criteria that the lender has established.

- o   A creditor also checks its customers' credit files periodically. This is referred to as Account Management, Account Maintenance or Account Review.
- o   A consumer can check his or her own credit report without impacting creditworthiness. This is referred to as a "consumer disclosure" inquiry.
- o   Employment screening inquiries.
- o   Insurance related inquiries.
- o   Utility related inquiries.

Inquiries that can have an effect on the creditworthiness of a consumer, and are visible to lenders and credit scoring models (also known as "hard inquiries"), are made by lenders when consumers are seeking credit or a loan. Hard inquiries can, but do not always, affect the borrower's credit score. Keeping credit inquiries to a minimum can help a person's credit rating.

### b. Scoring Models

#### (I) Multivariate Systems

Credit scoring models are what are referred to as multivariate, meaning they evaluate a variety of information on a credit report to generate a final score rather than simply one item.  No one credit item determines an individual's numeric credit score. In fact, the impact any one item is going to have on an individual's credit score is dependent on the other items on his or her credit report as well as what scoring environment (See Multi-Scorecard Systems below) is used to generate the consumer's final score.

#### (II) Multi-Scorecard Systems

Credit Scoring models are actually the consolidation of a multiple credit scoring systems called scorecards.  A scorecard is a credit-scoring model designed to evaluate the risk of a group of consumers who have certain credit file similarities (homogenous populations).  For example, a consumer with a bankruptcy on his or her credit report would be scored in a model or scorecard designed specifically to evaluate the credit risk of a consumer who had filed bankruptcy.  Another example is a consumer with a very limited amount of credit information (also known as a "thin file").  Most credit scoring systems have many scorecards, as there are many unique consumer profiles, each with different risk levels.  An individual's credit file is normally only scored using one scorecard.  The selection of the appropriate scorecard is made by the credit scoring system prior to rendering a final score by first evaluating the credit file and determining which scorecard is the most appropriate selection.

#### (III) Characteristics, Variables and Weights

Each scorecard (as described above) contains a series of characteristics, variables and weights.  A characteristic, as defined in a credit-scoring context, is a question asked of the credit report by the scoring system.  For example, "how many accounts with a balance are present" is a common characteristic in most credit risk models.  Other examples include:

- Does the consumer have any delinquencies on their credit report?
- How long has it been since the consumer's most recent delinquency?
- Does the consumer have a bankruptcy on their credit report?

Each of these examples is a plain English rendering of a technical process, meaning the credit scoring system can read the credit report in a machine-readable environment. There are almost always at least 12 and generally more characteristics in each scorecard. Each of the characteristics has what is referred to as a variable. A variable, in a credit-scoring context, is the series of available answers to the characteristics (questions). Using the above example of characteristics a set of example variables could be (in parentheticals):

- Does the consumer have any delinquencies on their credit report? (Yes/No)
- How long has it been since the consumer's most recent delinquency? (Less than 24 months ago/More than 24 months ago)
- Does the consumer have a bankruptcy on their credit report? (Yes/No)

The above example is overly simplified and meant to visually illustrate the relationship between characteristics and variables. Most characteristics have a much longer list of variable options.

Once the credit scoring system has completed the process of selecting the scorecard and calculating the proper variable to the characteristics of the scorecard then the model assigns weights or points accordingly. For illustrative purposes the assignment of points might work as follows:

- Does the consumer have any delinquencies on your credit report? (Yes) 0 points awarded out of a possible 100.
- How long has it been since the consumer's most recent delinquency? (Less than 24 months ago) 25 points awarded out of a possible 75.
- Does the consumer have a bankruptcy on their credit report? (No) 50 points awarded out of a possible 50.

Once the model has assigned weights/points to each variable, they are tabulated and a final score has been determined. The process described above is performed by computerized systems, and usually is accomplished very quickly. The score is appended to the credit report and delivered to the lender for its use in risk management processes.

### iv. How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users"). It is the process whereby the data users attempt to measure the downside financial risk of doing business with a consumer versus how much can be made if the product is priced appropriately. For example, if a consumer is a low risk consumer then a lender can be more aggressive with its loan pricing because it is more comfortable that the consumer will pay it back in time.

Alternatively, if a consumer is higher risk then the lender may avoid them altogether or charge them a higher interest rate in order to subsidize the risk posed by the consumer. Credit reports and credit scores have become synonymous with credit risk and risk based pricing. It would be highly unusual for a lender to grant any sort of credit or set financial terms without a review of the applicant's credit reports and credit scores. FICO scores, which have been largely available to lenders since the late 1980s, are the standard risk metric used in the United States, although other credit scores are used as well.

Other methods of assessing risk, for the purposes of pricing out a loan or insurance policy, are income, loan to value, debt to income, net worth, and property value. Additionally, some lenders might require security on their loans such as down payments or assets to secure property (such as in the case of a mortgage loan or auto loan).

### v. The Industry Standard Dispute Resolution Process

Consumers have the right to challenge information on their credit reports with either the credit reporting agencies directly or directly with the furnishing party (normally a lender or a collection agency). And, according to the Consumer Financial Protection Bureau ("CFPB") some 8,000,000 disputes were filed in 2011, suggesting that consumers not only understand their rights but are leveraging them as well.

When a consumer files a dispute with the credit bureaus they can do so via a variety of methods. They can file disputes via the credit bureaus' websites. They can file disputes using U.S mail. They can file disputes over the telephone. And, they can even file disputes in person if they so choose to visit a credit bureau office.

When a dispute is filed several things happen almost concurrently. The item in dispute is marked on the credit report as being "in dispute." This is accomplished by appending a code to the disputed item. This code, formally referred to as a Compliance Condition Code, is represented by the letters "XB."

When the XB code is appended to an item it renders it harmless to a consumer's FICO and VantageScore credit scores for the duration of the code's presence on the credit report entry. This allows the credit reporting agency and the data furnisher to perform their investigation without any adverse impact to the consumer's credit scores at the same time.

The consumer's dispute is interpreted into a dispute code. These codes are meant to capture the intended consumer dispute for communication with the furnishing party. For example, code "001" reads, "Consumer says not his or hers, Provide or confirm complete ID." There are several of these codes intended for use for all consumer disputes.

These codes and other consumer information is then pre-populated on a form called an Automated Consumer Dispute Verification ("ACDV") form and sent to the data furnisher normally via a web based system called "Online Solution for Complete and Accurate Reporting" or "e-OSCAR." Once the data furnisher receives the ACDV via e-OSCAR

they can clearly see the name and identification of the consumer and specifically what they are disputing about their account.

At that point the data furnisher normally reviews the information in their system to determine if the consumer's dispute requires a modification to their credit reports or if the item is being reported accurately. Either way, the data furnisher fills out a "response" portion of the ACDV form with directions to modify, delete or do nothing to the credit report entry and sends it back to the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response they will modify, delete or do nothing to the credit report entry.

At this point the investigation has been completed. The credit bureau will send a communication, normally in the mail, to the consumer with results of their investigation. This process can take up to 45 days as allowed by the Fair Credit Reporting Act but, according to the Consumer Data Industry Association ("CDIA") they are completed in much less time thanks to the automation.

If the consumer files a dispute directly with the data furnisher the process is similar but not identical. When a furnisher receives a dispute directly from a consumer they communicate to the credit reporting agencies that the item is in dispute ("XB" code as explained above). Concurrently the furnisher performs a similar investigation as described above and communicates the results to one, two, or all three of the credit reporting agencies in a process called "carbon copy."

The form used to communicate the change to the credit bureaus is called an Automated Universal Data form ("AUD"). It is sent to the credit bureaus using the same e-OSCAR system as explained above. The primary difference between the ACDV and AUD dispute process is the AUD is a one way communication to the credit bureaus while the ACDV is a back and forth communication between the credit bureaus and the furnisher.

These forms (ACDV, AUD) and their "non automated" predecessors (CDV, UDF) were created by the credit industry specifically for dispute resolution and have been used for even longer than I have been in the credit industry (since 1991). These forms and their use are well-established industry standards.

According to the CDIA some 30% of all disputes are filed by credit repair companies attempting to have negative but accurate information removed from credit reports in advance of the statutorily allowed time frames for reporting derogatory information, which is normally between 7 and 10 years depending on the credit entry.

### B. Summary of Opinions

#### i. Opinion #1 – The Investigation Process Undertaken by Capital One Was Reasonable and In Excess of Industry Practice

The Plaintiff has suggested in his Complaint that Capital One has violated the Fair Credit Reporting Act by not performing a reasonable investigation into his credit reporting dispute[3]. His sole basis for suggesting that Capital One's investigation was not reasonable is the fact that they refused to remove the accurate late payments from his credit reports, which were caused by the Plaintiff's refusal to make good on his contractual obligation to pay Capital One for their outlaid funds covering wind insurance. Verifying accurately reported information to the credit bureaus does not constitute an unreasonable investigation.

The Plaintiff's position suggests that if the late payments weren't removed then Capital One's investigation couldn't have been reasonable. He appears to be anchored to the position that, despite making a deficient monthly payment for several consecutive months, that he was never late. Submitting a deficient payment to a lender by the due date does not constitute an "on time" payment, which is a standard in the financial services industry and not specific to Capital One.

As part of my work in this case I personally interviewed members of Capital One's Mortgage Dispute Team including Wes Bernard who manages Capital One's credit bureau reporting and dispute team for home loan service, as well as managing the quality assurance work on the consumer credit dispute forms received by Capital One from the credit bureaus[4]. I wanted to get an in-depth understanding of Capital One's consumer dispute verification processes relative to their peers in the financial services industry. What I learned was Capital One employs procedures that either meet or exceed those employed by other large data furnishers from the financial services industry.

**Training and Support** – According to Mr. Bernard, Capital One trains employees that process consumer disputes by allowing them to sit with more seasoned employees. This side-by-side method of training is very common in the financial services industry. The employees that process mortgage related consumer disputes (the "Mortgage Dispute Team") only process mortgage related disputes and not disputes relative to other Capital One products. This allows the Mortgage Dispute Team to focus solely on mortgage accounts rather than the more voluminous Capital One credit card accounts. The Mortgage Dispute Team employees have ongoing access to Capital One's policies and procedures regarding credit bureau disputes via their internal website.

**Dispute Volume** – According to Mr. Bernard, Capital One's Mortgage Dispute Team's dispute volume ebbs and flows over time but currently it receives roughly 400-500 credit bureau disputes each month, which is a small fraction of the volume received by other data furnishers. Further, the Mortgage Dispute Team does not have a production quota when processing consumer disputes. This is also atypical, as most data furnishers require their staff members to process 80-120 disputes each day. The Mortgage Dispute Team's average time to respond to a consumer dispute received via the credit bureaus is roughly 3 weeks, which is fairly typical relative to their lending peers.

---

[3] 2nd Amended Complaint pages 42-43
[4] These forms are formally referred to as Automated Consumer Dispute Verification forms, or "ACDVs."

**Quality Assurance (QA)** – According to Mr. Bernard, disputes currently go through a double review process to assure accuracy when responding to consumer disputes. The Mortgage Dispute Team performs the initial investigation and then a "QA" employee reviews the work to ensure accuracy prior to formally submitting their results to the credit bureaus. This is atypical in the financial services industry as most of the credit dispute responses from higher volume "shops" take no longer than a few minutes and are processed by only one person. Clearly Capital One's process here is much more consumer friendly.

**Procedures** – According to Mr. Bernard, when the Mortgage Dispute Team receives a dispute form from the credit bureaus (the "ACDV") they first go to the appropriate servicing computer system to review all of the relevant information relative to the disputed account. They go through each data field or screen to validate the information. The servicing system allows them to retrieve any supportive documents from the Capital One archive imaging system, which they call "ECM." This allows them access to account documents and letters received by and sent to their customers.

The Mortgage Dispute Team can see if a monthly payment on an account goes up, why the monthly payment goes up, and can see the underlying documents supporting why the monthly payment has gone up. The Mortgage Dispute Team employees do not make a judgment call regarding the consumer's dispute but more so rely on the appropriate servicing system, account notes, archived documents from their imaging system, and on occasion reach out to other departments when necessary.

**Letters from Capital One to the Plaintiff's attorney** – In December 2011 and May 2013 Capital One received letters from the Plaintiff's attorney challenging the accuracy of their credit reporting. Capital One responded to both letters with an in depth chronology of events that justified their reporting of late payments to the credit reporting agencies including, but not limited to:

- Plaintiff being notified of his obligation to maintain wind coverage on this residence, which he apparently ignored
- Capital One's purchasing of wind insurance on behalf of the Plaintiff, and the cost
- Results of Capital One's multiple escrow analyses after they paid for wind insurance on behalf of the Plaintiff, and the subsequent credit to his escrow account after the Plaintiff eventually purchased his own wind insurance
- Plaintiff's refusal to remit the proper monthly payment caused by a considerable negative escrow balance
- Record of conversations Capital One had with the Plaintiff regarding his escrow shortage
- A refund of $360.65 sent to the Plaintiff in August 2013 representing an eventual escrow surplus

After my conversion with Mr. Bernard and reviewing the letters sent by Capital One to the Plaintiff's attorney it's clear to me that Capital One maintains reasonable procedures

which ensure the accuracy of their credit reporting and that those procedures were employed when the Plaintiff challenged the Capital One mortgage loan information on his credit reports. It also strongly suggests that Capital One performed multiple in depth investigations regarding the Plaintiff's credit reporting disputes, both submitted to the credit reporting agencies and directly to Capital One via his attorney.

### ii. Opinion #2 – The Plaintiff Had Other, Unrelated, Derogatory Information On His Credit Reports That Was Contributing To His Lower Credit Scores

The Plaintiff has suggested that the cause of his lower credit scores is the subject Capital One mortgage loan at issue in this lawsuit[5]. That is untrue. The Plaintiff has evidence of other unrelated derogatory information on his credit reports that also contributed to his credit scores.

Macy's – Charge Account – 30 days late in May 2012[6]
Capital One – Auto Lease – Settlement Accepted May 2007[7]

The settlement on the Capital One auto lease is considered a major derogatory item by credit scoring systems. As such, it could have a significant negative impact on a consumer's credit scores.

Finally, the Plaintiff and his co-applicant's credit scores were also being negatively impacted by the amount of debt they were carrying as evidenced by the "score factors" that accompanied their 6 FICO credit scores in February of 2013 when Quicken Loans accessed their 6 credit reports[8].

### iii. Opinion #3 – The Plaintiff Did Not Suffer Any Damages As A Result of the Defendant's Credit Reporting

Through his counsel the Plaintiff suggests that he has been damaged by Capital One because he was unable to refinance his Capital One mortgage loan in 2012 and 2013 as well as another unidentified "significant mortgage loan"[9]. There is no evidence of either actually occurring.

When a consumer is denied credit, or adversely approved, based on their credit reports and/or credit scores the lender is required by law to provide the applicant/s with two notices. The first notice is referred to as an "adverse action" notice, or more informally known as a declination letter. The adverse action letter must contain a reference to the source of the credit report data used as a basis of their adverse decision.

---

[5] P000092
[6] P000154
[7] P000155
[8] P000153
[9] P000092

Since August of 2011 a second notice is required when a credit score is used as a basis for an adverse decision. This notice is the "score disclosure" notice and must contain the applicant's credit score and some other information about the range of the score as well as where the applicant's score falls relative to the national distribution of credit scores. Neither of these two notices was provided to the Plaintiff in this case and neither of these two notices has been produced in this case, suggesting that the Plaintiff didn't actually apply for and be denied a loan but instead, at most, casually discussed lending options with one or more lenders.

Regarding the unidentified other "significant mortgage loan" that the Plaintiff suggests he was unable to refinance due to the subject Capital One mortgage credit reporting, there are no documents produced to evidence even a casual discussion regarding his refinancing options of the unidentified mortgage loan.

Regarding the Plaintiff's efforts to refinance his Capital One mortgage loan, the Plaintiff has produced an email chain between himself and an employee at Quicken Loans from March 11, 2013 to July 19, 2013[10]. This email chain represents the sole production memorializing his communication with a lender regarding his alleged attempt to refinance his Capital One mortgage loan. The chain of emails is nothing more than the Quicken employee giving the Plaintiff fees and rate information for various loan options. The sole mention of the subject Capital One mortgage credit reporting is Quicken asking the Plaintiff of the status of the Capital One credit reporting. Nothing in the email chain suggests, even tacitly, that the Capital One credit reporting caused the Plaintiff to be denied a refinance on this loan.

NOTE: None of the communication between the Plaintiff and Quicken Loans begins to address a significant problem with the Plaintiff's credit, which is the fact that he is in over $2.6 million of debt across 9 different accounts with an aggregate monthly obligation of roughly $16,870[11], in addition to the other unrelated derogatory credit entries.

### iv. Opinion #4 – The Plaintiff's Expert Witness's Opinions Are Either Baseless or Generalized Statements Regarding The Credit Industry

It appears the Plaintiff asked one of his acquaintances to serve as his expert witness in this matter. It further appears from reading the expert's report that most of the background regarding the alleged incorrect credit reporting by Capital One was told to him by the Plaintiff, rather than through independent research and document review. The Plaintiff's expert's 5 opinions in this matter are, including rebuttal:

1.  "good credit is important in today's world" – This seems to be a pretty obvious observation rather than a opinion that needs the justification of an expert. Good credit is indeed important and paying your bills on time in their proper amount is the primary method of earning and maintaining good credit. The Plaintiff's choice to not make his proper monthly payment contributed to him having "not so good" credit.

---

[10] P000146-151
[11] P000154

2. "Capital One should have accepted and applied the Plaintiff's monthly mortgage loan checks sent to Capital One for the months of July 2011 through April 2012..." – The Plaintiff's expert seems to ignore the fact that the payments being made to Capital One during the subject time period were not sufficient to satisfy the then current amount due. It's common knowledge in the banking industry that you have to make a full monthly payment rather that just "some" monthly payment in order for it to fully satisfy the obligation and that if the amount is deficient the lender may hold it in suspense or return the check, both of which are common practices in the mortgage industry.

3. "Capital One should not have filed its mortgage foreclosure complaint related to the mortgage loan in December 2011..." – Not only is it common for all lenders to attempt to recover security assets on defaulting installment loans but Capital One even notified the Plaintiff of their intention to continue foreclosure proceedings because of the Plaintiff's refusal to bring his mortgage loan current[12]. It's common knowledge that lenders foreclose and/or repossess properties/assets securing defaulted loans.

4. "Capital One should not have reported to the credit agencies that the Plaintiff was late making any monthly payments from July 2011 through April 2012..." – The only reason Capital One shouldn't have reported the late payments to the credit reporting agencies would have been if the Plaintiff was not, in fact, late on his mortgage payments. It's not in dispute that the Plaintiff was, in fact, late on his mortgage loan payments so reporting late payments to the credit bureaus was completely justified.

5. "...Capital One should have conducted a fair and reasonable investigation into all such matters and should have promptly changed, withdrawn, or made appropriate adjustments to it's adverse reporting of the mortgage loan.." – As with his 4 prior opinions, the Plaintiff's expert offers no citations and no factual basis for his opinions other than "I have been advised by James Davidson." It's simply not possible that he or anyone else could have concluded that Capital One's investigation procedures were either reasonable or unreasonable without a further understanding of their actual investigation practices. It appears the Plaintiff's expert's opinions were all based on conversations he had with the Plaintiff. The expert doesn't even consider the possibility that Capital One's credit reporting is completely accurate and the Plaintiff caused his own problems by A) neglecting to maintain proper insurance on his home and B) refusing to make the proper monthly payments.

It is my understanding that discovery continues in this case. As such, I reserve the right to supplement or amend my opinions as discovery continues, depositions take place and subsequent expert reports or other or additional documents are submitted. I declare that the foregoing is true and accurate to best of my ability based on the documents I have reviewed, my education, my experience, my training and expertise and that this Expert Report was signed in Atlanta, Georgia on September 23, 2014.

John R. Ulzheimer

---

[12] P000022

**Exhibit A**

# John Ulzheimer Bio and CV

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditexpertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FDCPA, FCRA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is twice FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has ~24 years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), SmartCredit.com (~3 years), and CreditSesame.com (~2 years).

John is the credit blogger for Mint.com, SmartCredit.com, CreditSesame.com, CreditCardInsider.com, and the National Foundation for Credit Counseling. John has been published and quoted thousands of times over the past 7 years on the topic of consumer credit. He has authored or created numerous educational materials on the subject including:

- The book, *The Smart Consumer's Guide to Good Credit*
- The book, *You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies.*
- The consumer handbook, *Surviving Identity Theft.*
- The consumer handbook, *The GetCreditWise ToolKit*

**Relevant Experience at Equifax** – Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac** – Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, Trans Union, Trans Union Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, members of Congress, consumer groups and consumers.

John frequently appears on CNBC, FOX News, CNN and Oprah's "Oprah and Friends" XM Satellite Radio. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, The Motley Fool, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John is regular guest lecturer at The Westminster Schools, The University of Georgia and the Georgia Consortium for Personal Financial Literacy. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term.

**Certifications**

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**